Filed 8/19/16  In re M.J. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.J., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. A.J., Defendant and Appellant. | A145629 (Alameda County Super. Ct. No. OJ15024543) |

This is an appeal from the juvenile court's jurisdictional order and dispositional order in dependency proceedings involving minor M.J. (minor) and her father, appellant A.J. (father). Father challenges the sufficiency of the evidence supporting these orders. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

On July 2, 2015[1], the Alameda County Social Services Agency (the agency) filed the operative pleading, an amended juvenile dependency petition, pursuant to Welfare and Institutions Code section 300, subdivisions (c) and (g) (hereinafter, petition).  The petition alleged, among other things, that minor, age 17, had suffered or was at substantial risk of suffering serious emotional harm as evidenced by severe anxiety,

---

[1]     The original petition in this case was filed on March 24, 2015.

depression, withdrawal, or untoward aggressive behavior toward herself or others due to her father's conduct, and had been left without adequate provision for support.[2] More specifically, the petition alleged minor had suffered sleep and appetite disturbances since age 15 due to fears engendered by her father's threats to force her to return to their home country of Yemen to enter into a marriage against her will (which marriage father arranged several years prior when minor was just 11 years old). The petition further alleged minor has had suicidal ideation caused by her father's threats, including two times between ages 15 and 16, one of which involved minor putting a knife under her blanket and crying herself to sleep. According to the petition, minor was unwilling to return to her father's care due to her fear that he would force her to marry this man in Yemen against her will.

The agency thereafter filed a report containing the following information regarding minor's background. Minor spent her first 11 years in Yemen with her mother before moving to the Bay Area with her father, siblings and step-mother. Minor recalled her father visiting her family for the first time in Yemen, during which visit father arranged for her to marry a well-known man in Yemen.[3] Minor's mother, while not opposing minor's move to the United States, remained in Yemen.

According to minor, she did not know her father well when she moved to the United States with him. She soon became afraid of him because "he never smiles, he's never nice to me, he calls me names and I'm treated like a slave in their house."

Minor also reported to the agency that her father planned for her to return soon to Yemen to be married. Although father never physically abused her, he had threatened her that she "would die" if she did not marry the man he had chosen for her. As she got older, father talked about the impending marriage more frequently, and had recently told

---

[2]    Unless otherwise stated, all statutory citations herein are to the Welfare and Institutions Code.

[3]    According to minor, she was told at the time they would be traveling to California "for a visit," although she has since lived here for over seven years.

her she would be returning to Yemen "this summer." Minor feared her father and what he would do to her if she refused to return to Yemen.

It was due to father's threats and intimidation that minor began having difficulty eating and sleeping at about age 11. Around age 15 or 16, minor began to think there was no way out but suicide, leading her to once take a knife to her bed, where she cried herself to sleep. Finally, in August 2014, minor, fearing she would not be safe if she refused to marry the Yemeni man, reached out to an adult that she knew from school, Mark S., for help. Mark arranged for minor to move into the East Bay home of his parents, Thomas and Linda.[4]

On August 14, 2014, father reported minor missing to the Oakland Police Department, and also hired a private investigator to find her. Several months later, on March 21, 2015, minor was delivered by police into protective custody because she refused to go home to her father. Minor, who continued to live in the home of Thomas and Linda, was interviewed on March 21 by social worker Karen Kaufman and, shortly thereafter, by clinician Mia Hogains of the Westcoast Children's Clinic.

On March 27, 2015, Hogains reported that minor had "active suicidal ideation and . . . intent to plan." Specifically, Hogains reported that minor "inten[ded] to kill herself if returned to her father and or family/community due to her fear of what would happen if with father or family." Hogains then noted minor's clinician going forward would be Truc Nguyen. Nguyen, in turn, reported on March 27, that minor had active suicidal ideation and that her placement was unstable due to religious differences.

On March 31, 2015, social worker Kaufman reported having spoken to Officer Mark Douglas of the Oakland Police Department, who, in turn, had interviewed minor and believed that "the minor's concern [wa]s real and that there was money exchanged for her." On May 7, 2015, Officer Douglas further reported that he had been informed by father that minor was romantically involved with Mark S., but that the officer believed

---

[4]     Father contends minor has, or has had, a romantic relationship with Mark. Minor denies this contention, and Mark has invoked his constitutional rights under the Fifth Amendment for purposes of these proceedings.

3

this was merely a "smoke screen" and that minor's situation was one of "abuse case with mental stress." Accordingly, the officer scheduled minor for a CALICO interview.

On May 7, 2015, clinician Nguyen reported that minor had improved in her foster care placement and was no longer having suicidal ideation, noting: "She seems to be in a much better place and is not as acute as she was."

Minor's detention hearing began March 25, 2015. The agency filed a report in anticipation of this hearing in which, based upon the information set forth above, it recommended that minor be detained. The juvenile court agreed at the conclusion of the hearing, finding the agency had made a prima facie showing that minor came within the identified subdivisions of section 300, and that her removal was necessary. The court then set a contested jurisdictional/dispositional hearing for May 11, 2015.

In anticipation of this hearing, the agency prepared another report in which social worker Kaufman concluded based upon interviews with minor, father, Officer Douglas, and Nguyen, that: "Due to the minor's continuous fear that she will die if she does not return to Yemen to be married against her will, the minor . . . is not safe at home at this time." Kaufman further concluded that minor "would benefit from being declared a dependent of the Court [so] that she can take advantage of the AB12 services offered through the Agency."

The jurisdictional/dispositional hearing ultimately took place over several days in May and June of 2015. Minor, father, and Nguyen testified. In addition, while the hearing was pending, the agency filed two addendum reports, which noted that minor's case had been transferred to social worker Marie Moore, who spent time with minor on June 12, 2015, when minor appeared in court to testify on father's paternal status. Moore described minor in the addendum report as quite anxious and emotional on the day of the hearing, "weep[ing] quietly and hid[ing] her face in her hands" throughout the day. Minor became particularly upset after learning that her mother, when reached by telephone in Yemen, had contradicted minor's claim that she had received an engagement ring from the man in Yemen. According to Moore, minor became "inconsolable," stating that, "I really love my mom . . . now, I have nobody. I never thought she would not be

4

truthful about the ring." Then, when Moore asked minor to lunch during a court break, minor was "initially reluctant to go because she was wary and afraid that she would see someone in their community that recognized her." At lunch, minor refused to eat, stating that she had no appetite. She also described having difficulty sleeping "because I don't know what's going to happen with my dad. I'm so afraid that someone is going to do something to me." Then, according to Moore, during their drive back to the courthouse, minor ducked down in the car and said in a scared voice: "I just saw my dad but I don't think he saw me."

Moore also stated in the addendum report that minor became progressively more anxious and frightened during the afternoon, noting that minor was "noticeably shaken and [that] no amount of assurance made her relax." This increasing anxiety led minor to check herself into the UC Davis psychiatric facility at the end of the day, expressing fear that she would harm herself if left alone.

Sonya Hernandez, the social worker who transported minor to this psychiatric facility on June 12 likewise reported that minor "seemed very overcome by seeing her dad today." During their car ride, minor told Hernandez that she sometimes feels "things are too dark and she needs to leave it all behind." While acknowledging that she was unable to eat or sleep or stop thinking about her situation, minor insisted to Hernandez that: "I'll never give up. I want to go to college and I want to do things with my life that my culture frowns on. I know I've embarrassed my dad. I know that I am an outcast in my culture and that I can't trust any of them because my father tells them things about me that aren't true." Minor then added: "[Father's] angry and no matter what he says, I don't believe him and I know that he's going to do something if I go back, and I can't do that."

Minor testified a week or so later, on June 26, 2015. She stated that she was scared her father would make her get married and forgo an education. Minor also told the court father had threatened her, telling her: "You would die if you're not going to get married." Minor then described in detail the marriage that had been arranged when she was just 11 years old, including details about the engagement ring and gold necklace that she received as gifts (which her mother had kept for her), and the engagement celebration

that she attended with her family and the Yemeni man's family. Although minor did not understand at the time, father paid this man a partial dowry in cash, and also arranged for the engagement of minor's older sister, Hana, before returning with them to the United States. Minor was scared her mother would also be harmed if minor refused to go back to Yemen to get married.

Nguyen, the clinician who worked with minor for about two months starting in March 2015, testified that minor suffered from "major depressive disorder" and "a lot of anxiety." In addition, minor had "situational suicide intention" that "had to do with the circumstances of her removal." Minor's symptoms included "fatigue, inability to focus . . . negative self-thoughts, suicidal ideation, inability to manage and self-regulate, just to name a few." In particular, when Nguyen met with minor the day after minor's initial placement, she observed that minor "didn't feel safe, was hypervigilant, was scared, especially around night time." These symptoms, according to Nguyen, were "certainly present" and "affected . . . not just her mental health, but her physical health as well." Minor had a difficult time expressing her feelings, which resulted in her inability to eat or sleep. Sometimes, minor was so anxious that she would shake. In one instance, Nguyen had to calm minor down, as she appeared to be experiencing a "trauma response of either fight or flight." Ultimately, Nguyen concluded that minor was sincere and consistent in her fear that she would be returned to Yemen to marry against her will and had a "large emotional distress response any time speaking about her father or her family." As such, she assessed minor as suffering "emotional abuse."

Father, in turn, testified that he never arranged a marriage for minor or otherwise abused her. Father insisted that he had forgiven minor for running away and wanted her to come home.

On June 29, 2015, at the conclusion of the contested jurisdictional/dispositional hearing, the juvenile court sustained the allegations in the petition under section 300, subdivisions (c) and (g), and found by clear and convincing evidence that minor's return to the home of father would cause a substantial danger to the physical health, safety, protection, or physical or emotional well-being of minor, and there were no reasonable

6

alternative means to protect her. The juvenile court thus ordered minor to be placed in a suitable family home or private institution, and ordered supervised visitation for father and reunification services for both parents. The court then set the matter for a status review hearing on December 14, 2015. On July 2, 2015, father filed a timely notice of appeal.

## DISCUSSION

Father raises the following issues for our review. First, father contends the jurisdictional order is legally unsupported because there is no substantial evidence that father caused emotional harm to minor (§ 300, subd. (c)), or left her without appropriate care (§ 300, subd. (g)). Second, father contends the dispositional order is likewise legally unsupported because there is no clear and convincing evidence that minor's removal from his care was necessary to protect her from actual, imminent physical harm. We address each issue in turn below.

## I. Substantial Evidence Supports the Court's Jurisdictional Order.

Father contends there was insufficient evidence to support the jurisdictional findings that minor came within the provisions of section 300, subdivisions (b) and (g). Section 300, subdivision (b)(1), authorizes a minor to be adjudged a dependent of the juvenile court where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." Section 300, subdivision (g), in turn, applies where "[t]he child has been left without any provision for support; . . . the child's parent has been incarcerated or institutionalized and cannot arrange for the care of the child; or . . . the whereabouts of the parent are unknown, and reasonable efforts to locate the parent have been unsuccessful." (§ 300, subd. (g).)

"At a jurisdictional hearing, the juvenile court ' "shall first consider . . . whether the minor is a person described by Section 300, and for this purpose, any matter or

information relevant and material to the circumstances or acts which are alleged to bring him or her within the jurisdiction of the juvenile court is admissible and may be received in evidence. However, proof by a preponderance of evidence, legally admissible in the trial of civil cases must be adduced to support a finding that the minor is a person described by Section 300." ' [Citation.] **[¶]** 'While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm.' [Citation.]  Thus previous acts of neglect, standing alone, do not establish a substantial risk of harm; there must be some reason beyond mere speculation to believe they will reoccur." (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564-565.)

On appeal, where, as here, a parent contends there is insufficient evidence to support a jurisdictional finding, "we review the evidence most favorably to the court's order — drawing every reasonable inference and resolving all conflicts in favor of the prevailing party — to determine if it is supported by substantial evidence.  [Citation.]  If it is, we affirm the order even if other evidence supports a contrary conclusion." (*In re N.M.* (2011) 197 Cal.App.4th 159, 168.)  At the hearing, "the child welfare agency must prove by a preponderance of the evidence that the child who is the subject of the petition comes under the court's jurisdiction.  (§ 355; *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248 [19 Cal.Rptr.2d 698, 851 P.2d 1307]; [citation].)  On appeal, the parent has the burden of showing there is insufficient evidence to support the order." (*In re N.M., supra,* 197 Cal.App.4th at p. 168.)

Further, where, as here, a dependency petition alleges the existence of multiple statutory grounds for making the minor a juvenile dependent, the reviewing court may affirm the dependency court's finding of jurisdiction so long as any one of these grounds is supported by substantial evidence.  (See *In re Alexis E.* (2009) 171 Cal.App.4th 438, 450-451.)  Thus, where one statutory ground is supported by substantial evidence, the reviewing court need not consider any other alleged ground before affirming the court's jurisdictional order.  (*In re Ashley B.* (2011) 202 Cal.App.4th 968, 979.)

8

Here, there is no doubt the record, when viewed in a light favorable to the juvenile court's judgment, contains sufficient evidence to sustain the dependency petition under section 300, subdivision (b).  First, minor herself testified regarding her fear and anxiety arising from her father's insistence that she return to Yemen to marry a man against her will, as well as regarding the threats that her father had made that she would "die" if she refused to return to Yemen for this marriage.  In addition, minor described feeling "unhappy all the time" and "alone" based upon these fears.  While father suggests minor is not credible or emotionally stable, the juvenile court disagreed and, indeed, noted for the record that it wholly believed minor's testimony.[5]  We decline to second-guess the juvenile court's credibility determinations on appeal.  (*People v. Hovarter* (2008) 44 Cal.4th 983, 996 [credibility determinations are "the exclusive province of the trial judge"].)

Moreover, while testimony from a single competent witness (like minor) may constitute substantial evidence in support of the juvenile court's order (*In re Alexis E., supra,* 171 Cal.App.4th at pp. 450-451), in this case there is additional support.  Corroborating minor's testimony, multiple social workers and clinicians who have worked with minor during these proceedings described observing first-hand the anxieties and fears she harbors as a result of father and his intent to force her to return to Yemen for a marriage arranged against her will when she was just 11 years old.  For example, social worker Moore described minor as distraught upon learning that her mother had denied that minor was given an engagement ring by the Yemeni man to whom she was engaged.  Moore, who took minor to lunch during a court break, described minor as inconsolable, unable to eat, and, later, scared when she thought they had driven by father

---

[5]     Father also insists that minor could not legally be sent to Yemen at this time because she does not have a valid passport, as hers has expired and he has made no effort to get her a new one.  Even assuming father is correct in regard to these facts, the law is clear that, in assessing whether substantial evidence exists to support a lower court ruling, we must not reweigh the evidence or substitute our judgment for the lower court's unless it is against the manifest weight of the evidence, considered as a whole.  (See *People v. Hovarter* (2008) 44 Cal.4th 983, 996.)

9

on the way back to the courthouse. In addition, social worker Hernandez described minor as "very overcome" upon seeing father in court. She also stated that minor's anxieties had, in fact, worsened toward the end of the day, with the result that minor was taken to a psychiatric facility in order to avoid self-harm.

And finally, clinician Truc Nguyen testified in court that she believed, based on her discussions with minor, that minor sincerely believed and feared that she would be sent back to Yemen by her father. Nguyen also gave her professional assessment that minor had suffered emotional abuse and "situational suicide intention . . . [that] had to do with the circumstances of her removal."

Given this substantial evidence supporting the court's finding that minor came within the description set forth in section 300, subdivision (b), no further showing is required for us to affirm the juvenile court's jurisdictional order. (See *In re Ashley B., supra,* 202 Cal.App.4th at p. 979 [where one statutory ground is supported by substantial evidence, the reviewing court need not consider any other alleged ground before affirming the court's assertion of jurisdiction over minor].) Simply put, while father continues to insist there is no evidence that minor has actually suffered any illness or injury as a result of his alleged parental shortcomings, the evidence set forth above, including Nguyen's professional assessment that minor had suffered emotional abuse and "situational suicide ideation" arising from the "circumstances of [her] removal," proves otherwise. There is no legal basis for reversing the jurisdictional order in this case.

## II. Substantial Evidence Supports the Court's Dispositional Order.

Father also raises an evidentiary challenge to the juvenile court's dispositional order removing minor from his custody after finding clear and convincing evidence that minor's return home would cause substantial danger to her physical health, safety, protection, or physical or emotional well-being, and there were no reasonable alternative means to protect her. According to father, this order is not supported by the evidence because, to remove a child from a parent's home pursuant to section 361, subdivision (c)(1), there must be evidence of "some threat of actual physical harm, not simply a threat to the child's emotional well- being." Further, with respect to the availability of

10

reasonable alternative means of protection, father contends there was "no legal reason" to remove minor because she was just months from her 18th birthday, "[y]et doing so had an extremely prejudicial impact of humiliating this family in its Islamic culture for no true protective reason."

As a threshold matter, we reject father's contention that a child may not be removed from the home in the absence of clear and convincing evidence of "some threat of physical harm." Section 361, subdivision (c) provides in relevant part: "(c) A dependent child shall not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of *any of the following circumstances* listed in paragraphs (1) to (5) . . . :

 "(1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody . . . [¶] . . . [¶] "(3) The minor is suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward himself or herself or others, and there are no reasonable means by which the minor's emotional health may be protected without removing the minor from the physical custody of . . . her parent . . . ." (§ 361, subd. (c)(1), (3); italics added.)

Here, minor met the legal standard under section 361, subdivision (c)(1), given the clear and convincing evidence that, due to father's threats to send her to Yemen to marry against her will, minor had and would continue to face substantial danger to her emotional well-being, which, in turn, put her physical health in jeopardy, such that removal from father's physical custody was necessary for her protection. In particular, several professionals who had worked with minor during these proceedings, including social workers Kaufman and Hernandez, noted that minor had difficulty eating and sleeping due to her fears and anxieties. Even more troubling, however, clinician Nguyen assessed minor as having situational suicide ideation, a condition that had also presented

11

when minor was 15 and 16 years of age, prompting her, once, to take to her bed, crying and holding a knife under her blanket, due to father's threats to force her to return to Yemen to marry against her will. Clearly, this assessed risk of suicidal tendency implicates minor's physical health and safety. As such, no further showing is required for this court to affirm the juvenile court's disposition. (See *In re H.E.* (2008) 169 Cal.App.4th 710, 720 ["case law has long construed section 361 as allowing removal where 'return of the child would create a substantial risk of detriment to the child's physical *or* emotional well-being' (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308 . . . , citing in part former § 361, subd. (b)), which anticipated the current language of subdivision (c)(1)"]; see also *In re H.E., supra,* 169 Cal.App.4th at pp. 723-724 ["Our review on appeal follows the ordinary rules for substantial evidence, notwithstanding that the finding below had to be made by clear and convincing evidence. [Citations.] Viewing the evidence in the light most favorable to the finding, and presuming in its support the existence of every fact the trier could reasonably deduce, we ask whether any rational trier of fact could have made the finding by the requisite standard"].)

However, even assuming for the sake of argument father is correct there is no imminent threat to minor's physical health or well-being, there is no doubt, given the evidence just described, that minor would come within the standard set forth in section 361, subdivision (c)(3), which is directed at children, like minor, who have suffered, or are at substantial risk of suffering, emotional harm. (See *In re K.S.* (2016) 244 Cal.App.4th 327, 342 [affirming removal order where "the record sufficiently supports the juvenile court's conclusion that K.S. is suffering or is at risk of suffering severe emotional damage and there are no reasonable means to protect K.S.'s emotional health without removing her from mother's custody"].) While father may be correct that the juvenile court cited subdivision (c)(1) rather than (c)(3), principles of appellate procedure are quite clear that we may affirm on any legal ground supported by the record. (*In re Terrance B.* (2006) 144 Cal.App.4th 965, 975 ["we review juvenile court's ruling, not its reasoning, and may affirm if it was correct on any ground"].) Accordingly, under section 361, subdivision (c)(1) or subdivision (c)(3), we may affirm the juvenile court's order.

In so concluding, we acknowledge father's concerns about suffering prejudice as a result of the court's order in light of the family's Islamic heritage. Specifically, father contends the juvenile court has been culturally insensitive in removing minor from his care, with the "unintended consequence" of bringing shame to his family. While we accept these proceedings may have been painful to all parties in this case, as dependency proceedings so often are, it is well established that " the purpose of a dependency proceeding . . . is to protect the child, [and not to] prosecute the parent's." (*In re Alexis H.* (2005) 132 Cal.App.4th 11, 16.) As such, when reviewing juvenile court orders, we must stay focused on the needs of the child rather than on any potential prejudice to the parent arising from the court's decision. And, having done so in this case, we conclude the challenged orders must be affirmed.[6] [7]

---

[6] We deny father's request for judicial notice, dated July 5, 2016, for failure to comply with applicable rules of court, including, but not limited to, the requirement that the moving party specify why the particular matter to be noticed bears relevance to the appeal. (Cal. Rules of Court, rule 8.252(a) ["(1) To obtain judicial notice by a reviewing court under Evidence Code section 459, a party must serve and file a separate motion with a proposed order. [¶] (2) The motion must state: [¶] (A) Why the matter to be noticed is relevant to the appeal; [¶] (B) Whether the matter to be noticed was presented to the trial court and, if so, whether judicial notice was taken by that court; [¶] (C) If judicial notice of the matter was not taken by the trial court, why the matter is subject to judicial notice under Evidence Code section 451, 452, or 453 . . ."].)

[7] Because we affirm on the merits, we need not address the agency's argument that this appeal is moot in light of minor having reached the age of maturity.

## DISPOSITION

The jurisdictional order and dispositional order of June 29, 2015 are affirmed.

_____
Jenkins, J.

We concur:

_____
McGuiness, P. J.

_____
Pollak, J.